## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUTTERFIELD HEALTH CARE, INC. d/b/a MEADOWBROOK MANOR OF BOLINGBROOK, 431 West Remington Blvd. Bolingbrook, IL 60440 <br><br> Plaintiff, <br><br> v. <br><br> SMALL BUSINESS ADMINISTRATION, 409 3rd Street, SW Washington, DC 20416, <br><br> ISABELLA CASILLAS GUZMAN, Administrator, Small Business Administration, 409 3rd Street, SW Washington, DC 20416, <br><br> Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiff Butterfield Health Care, Inc., *dba* Meadowbrook Manor of Bolingbrook ("Bolingbrook" or "Company") submits this action seeking judicial review of an arbitrary and capricious decision by Defendants, the United States Small Business Administration ("SBA" or "Agency") and Isabella Casillas Guzman in her official capacity as Administrator of the SBA, to deny forgiveness of Plaintiff's Paycheck Protection Program ("PPP") loan received pursuant to the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020).

## NATURE OF THE ACTION

1.      Congress passed the CARES Act to mitigate the economic devastation and mass unemployment caused by the COVID-19 pandemic. As part of the CARES Act, Congress created

1

the PPP, which authorizes the SBA to guarantee loans to small businesses and to forgive those loans if the businesses meet certain requirements.

2.      A primary goal of the PPP was to ensure continued employment and income for the employees of small businesses. As federal courts have since noted, "Congress intended that the SBA would make the PPP loan guarantees widely available to small businesses across the commercial spectrum." *DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*, 459 F. Supp. 3d 943, 946 (E.D. Mich. 2020).

3.      Recognizing that the nature of the COVID-19 pandemic and its devastating impact on small businesses warranted the establishment of a wider-reaching program, Congress relaxed many of the strict requirements found in prior SBA loan programs in order to increase the number of businesses eligible to receive PPP loan relief.

4.      In particular, the CARES Act rescinded certain aspects of the SBA's affiliation rules in 13 C.F.R. § 121.301, including rules regarding affiliation based on identity of interest due to common investments, economic dependence, and totality of the circumstances. Thus, the SBA's affiliation rules for PPP loans are less restrictive than those applicable to government contractors and to other federal financial assistance programs.

5.      Bolingbrook is a nursing home facility that serves both short-term, post-hospital rehabilitation patients and long-term residents. The Company seeks to provide exceptional clinical care and rehabilitation services coupled with amenities that promote healing and comfort for patients and residents. Like many nursing homes across the country, the COVID-19 pandemic significantly impacted Bolingbrook—not only because of public health restrictions and staff turnover but also by the loss and heartbreak caused by the deaths of beloved facility residents.

6.      Bolingbrook applied for a PPP loan on April 14, 2020, which the SBA approved on April 28, 2020. The loan helped Bolingbrook mitigate some of the financial insecurity caused by the pandemic. After using the entirety of the loan on employee payroll, Bolingbrook applied for forgiveness of the loan on August 18, 2020.

7.      After a series of communications with the SBA, the SBA issued a Final Loan Review Decision denying Bolingbrook's PPP forgiveness application on March 23, 2022. The SBA alleged that Bolingbrook was ineligible for the PPP loan it received because it was affiliated with other entities and, therefore, did not meet the small business size standard applicable to PPP loans.

8.      Bolingbrook appealed the Final Loan Review Decision to the SBA's Office of Hearings and Appeals ("OHA"). *See* Ex. 1 (Administrative Record[1]). OHA upheld SBA's decision but, in doing so, plainly misconstrued the PPP's affiliation rules and made material factual errors that disregarded the evidence that Bolingbrook provided in its appeal. Bolingbrook sought to explain the deeply flawed nature of OHA's decision through a request for reconsideration, but OHA declined to reverse its own decision and denied the request.

9.      A reconsidered initial decision from OHA becomes the final decision of the Agency either 30 days after its service unless the SBA Administrator, solely within the Administrator's discretion, decides to review or reverse the reconsidered initial OHA decision. *See* 13 C.F.R. § 134.1211(c) ("OHA will decide the request for reconsideration and OHA's decision on the request for reconsideration is a reconsidered initial OHA decision…. A reconsidered initial OHA decision becomes the final decision of SBA 30 calendar days after its service…."). As a result, OHA's

---

[1] The Administrative Record contains confidential and sensitive personal and business information. Therefore, a redacted version of the Administrative Record has been filed as Exhibit 1 and an unredacted version of the Administrative Record will be filed under seal.

unreasonable, arbitrary, and capricious decision upholding SBA's denial of Plaintiff's loan forgiveness application is the final decision of the Agency and properly subject to this appeal.

## PARTIES

10.    Bolingbrook is an Illinois company located at 431 West Remington Boulevard, Bolingbrook, Illinois 60440. Bolingbrook operates a small nursing home facility.

11.    Defendant SBA is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633 et seq. Under the CARES Act, the SBA administers the PPP.

12.    Defendant Isabella Casillas Guzman is the Administrator of the SBA and is sued in her official capacity only.

## JURISDICTION AND VENUE

13.    Plaintiff brings suit against the Defendants pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and in compliance with SBA regulations (*see* 13 C.F.R. § 134.1201(g) ("Final decisions may be appealed to the appropriate Federal district court only.")).

14.    Because Plaintiff's claims against the Defendants arise under the APA and the federal CARES Act, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## CARES ACT AND PPP RULES AND REGULATIONS

16.    The CARES Act placed the PPP within the existing statutory framework of 15 U.S.C. § 636(a), which authorizes the SBA to issue loans to small businesses. However, Congress modified Section 636(a) as it applied to the PPP, expanding loan eligibility to businesses that

would not ordinarily be eligible for a small business loan. *See* CARES Act § 1102, codified at 15 U.S.C. § 636(a)(36).

17.     Through the PPP, SBA guaranteed loans to small businesses and other entities to enable those businesses to retain and pay employees and to continue operations during the pandemic. Congress instructed that those borrowers who adhered to the program's requirements were then eligible to have their PPP loans forgiven in full.

18.     Since the passage of the CARES Act, the SBA adopted dozens of Interim Final Rules ("IFRs") to administer the PPP, including rules regarding the eligibility of businesses to receive loans and the requirements businesses must meet to have those loans forgiven.

19.     The SBA's first IFR goes to loan eligibility and provides, in relevant part, that a business is eligible for a PPP loan if it has "500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry" and it is "[a] small business concern as defined in section 3 of the Small Business Act (15 U.S.C. § 632), and subject to SBA's affiliation rules under 13 C.F.R. § 121.301(f) *unless specifically waived in the Act*." 85 Fed. Reg. 20812 (Apr. 15, 2020) (emphasis added).

20.     The SBA's affiliation rules, as applicable to the PPP program, provide that affiliation can exist in one of several ways, including through ownership, management, and identity of interest. The rules provide, in pertinent part:

> Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists . . .
>
> > (1) Affiliation based on ownership. For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to

control, SBA will deem the Board of Directors or President or Chief Executive Officer (CEO) (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern . . .

(4) Affiliation based on identity of interest. Affiliation arises when there is an identity of interest between close relatives, as defined in 13 CFR 120.10, with identical or substantially identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area) . . .

13 C.F.R. § 121.301(f).

21.     However, the CARES Act also waived certain SBA affiliation rules in 13 C.F.R. § 121.301, including rules regarding affiliation based on identity of interest due to common investments, economic dependence, and totality of the circumstances. Thus, for purposes of the PPP, businesses are not found to be affiliated on these grounds.

## FACTUAL BACKGROUND

### A.     Ownership and Management of Plaintiff

22.     Bolingbrook is a nursing home facility that serves both short-term, post-hospital rehabilitation patients and long-term residents. Bolingbrook's mission is to provide exceptional clinical care and rehabilitation coupled with amenities that promote healing and comfort for its patients and residents.

23.     Like many nursing homes across the country, the COVID-19 pandemic decimated Bolingbrook and its resident community. Bolingbrook used its PPP loan to retain staff and maintain its operations. As a result of Bolingbrook's efforts during the pandemic to try to protect the health and safety of its staff and residents, it received recognition for its COVID-19 preparedness and safety measures.[2]

---

[2]  Bolingbrook Received Telligen's Blue Ribbon in COVID-19 Vigilance Award. *See* https://meadowbrookrehabilitation.com/2022/08/05/meadowbrook-bolingbrook-receives-telligens-blue-ribbon-in-covid-19-vigilance-award/.

24.     Bolingbrook is owned by members of two separate families, the Jafaris and the Vangels. *See* Ex. 2 (Bolingbrook Shareholders Agreement). As the chart below reflects, no individual family member holds more than 25% of the ownership in Bolingbrook. When the ownership interest of each member of the Vangel family is aggregated, it equals 50%. Similarly, the aggregated ownership interests of the individual Jafari family members equals 50%.

25.     This structure was not a matter of happenstance, but rather a deliberate decision by the Jafari and Vangel families to ensure that no one individual owner or family alone can manage or determine the fortunes of the business. None of the owners of Bolingbrook—each a minority shareholder—can exercise negative controls over the ordinary actions of the business.

26.     The board of directors for Bolingbrook reflects its separate individual or family ownership equity, and thus, no individual, entity, concern, or family can control the board. *Id.* at 14-15.

27.     Although Bolingbrook's by-laws indicate that a "President" oversees the business of the company, this title is merely a corporate formality rather than a reflection of Bolingbrook's actual management. *See* Ex. 3 (Bolingbrook By-Laws at 8). Importantly, the by-laws stipulate that the president *does not have control* over the management of the company and instead acts *"[s]ubject to the direction and control of the board of directors*[.]" *Id.* at 8 (emphasis added).

28.     Bolingbrook does not have a current shareholder agreement. The Company's most recent agreement dates back to January 1, 1995, and this agreement lists Dr. Kianoosh Jafari as "President" of Bolingbrook. *See* Ex. 2 at 22. However, Dr. Jafari does not actually wield the powers generally attributed to a president and is in no way engaged in the running of Bolingbrook. *See* Ex. 4 (Declaration of Dr. Kianoosh Jafari); Ex. 5 (Declaration of Christopher Vangel). Dr.

Jafari's title gives him no greater control over Bolingbrook than the other minority owners and board members.

29.     In fact, Illinois law requires that a licensed, full-time administrator be the one to directly supervise Bolingbrook as a licensed nursing facility. *See* 210 Ill. Comp. Stat. 45/3-117(6). Illinois law defines a nursing home administrator as "a person who is charged with the general administration and supervision of a facility and licensed, if required, under the Nursing Home Administrators Licensing and Disciplinary Act…." 210 Ill. Comp. Stat. 45/1-105.

30.     In accordance with Illinois law, Bolingbrook's Administrator, Amy Hammond, who is unrelated to either the Jafari or Vangel families, controls the day-to-day operations of Bolingbrook. *See* Ex. 6 (Bolingbrook Organizational Chart); *see also* Ex. 7 (Administrator Authority at 1) ("The primary purpose of this position is to direct the day-to-day functions of the facility in accordance with current federal, state and local standards, guidelines and regulations that govern nursing facilities to assure that the highest degree of quality care can be provided to residents at all times.").

31.     Ms. Hammond's responsibilities as Administrator include:

- Assume the administrative authority, responsibility, and accountability for all programs in the facility.
- Establish the planning, development, implementation, monitoring and execution of recruitment selection and retention practices.
- Assist in the recruitment and selection of competent department directors, supervisors, facility non-licensed staff consultants, etc.
- Counsel/discipline personnel as requested or as necessary in accordance with local, state, and federal labor laws; stay abreast of labor law changes and implement appropriate facility policies to reflect changes.
- Delegate administrative authority, responsibility and accountability to other staff personnel as deemed necessary to perform their assigned duties.
- Ensure that an adequate number of appropriately trained, competent, licensed professionals and non-licensed personnel are on duty at all times to meet the needs of the residents.

- Terminate employment of personnel when necessary, documenting and coordinating such actions with the Director of Human Resources.
- Authorize the purchase of major equipment/supplies in accordance with established purchasing policies and procedures.
- Develop and manage annual operational and capital budgets.

*See* Ex. 7 at 1-5.

32. The Nursing Home Administrator License and Application for Bolingbrook show that Amy Hamond is the legal operator of Bolingbrook. *See* Ex. 8 (Bolingbrook License and Application). On the license application, Dr. Jafari is simply listed as a "physician" and 12.5% owner. *Id.* at 2. It is Amy Hammond who signs the license application as the "Facility Administrator and/or Owner." *Id.* at 11. It is Ms. Hammond who is designated by Illinois state law as the operator of the facility, and without her license, the facility could not operate. In contrast, Dr. Jafari has never held a nursing home administrator license and—pursuant to state law—cannot be the one directly responsible for operating the nursing home entities.

**B.    Other Butterfield Healthcare Entities**

33. Members of the Jafari and Vangel families also hold ownership interests in a group of entities we will refer to as the "Butterfield entities."[3]

| The "Butterfield" Entities |
|---|
| 1. Butterfield Health Care II, Inc. dba Meadowbrook Manor of Naperville ("Naperville") |
| 2. Butterfield Health Care VII, LLC dba Meadowbrook Manor of LaGrange ("LaGrange") |
| 3. Butterfield Health Care Group, Inc. ("Butterfield HCG") |
| 4. Beaver Creek Construction, LLC ("Beaver Creek") |

34. As with Bolingbrook, no individual holds a majority or a controlling interest in any of the Butterfield entities. While the various Butterfield entities do have overlapping *minority* owners, none of the individual owners (or their family members collectively) hold "more than 50

---

[3] By grouping these entities, Plaintiff is not implying or conceding any affiliation between them. The grouping is solely for ease of reference and explanation.

percent" of any of these entities, and thus, no family or individual holds majority control of any of the Butterfield entities. 13 C.F.R. § 121.301(f).

### 1.    Ownership of the Butterfield Entities

35.    As the charts below reflect, members of the Jafari family own 50% of Naperville, LaGrange, Butterfield HCG, and Beaver Creek. They do not own "more than 50 percent" of any of these entities. 13 C.F.R. § 121.301(f). Similarly, members of the Vangel family (which includes the Vangels, Dimases, and Hocuks) own 50% of Naperville, LaGrange, Butterfield HCG, and Beaver Creek. They do not own "more than 50 percent." 13 C.F.R. § 121.301(f).

36.    As with Bolingbrook, the voting equity of each shareholder or member in each of the Butterfield entities is equal to the shares or interest they own in the entity. *See* Ex. 9 (Naperville Shareholders Agreement at 16); Ex. 10 (Butterfield HCG By-Laws at 3); Ex. 11 (LaGrange Operating Agreement at 19); Ex. 12 (Beaver Creek Operating Agreement at 20). For example, Nicholas Vangel owns a 10% interest in Butterfield HCG; therefore, he holds 10% of the voting equity.

37.    The boards of directors for Naperville and Butterfield HCG reflect the respective separate individual or family ownership equity of each entity—and no individual, entity, concern, or family is able to control the board of any of the entities. *See* Ex. 9 at 14-15; Ex. 10 at 6. Similarly, at LaGrange and Beaver Creek, where the entities have boards of managers—rather than boards of directors—each family chooses one of the two managers. *See* Ex. 11 at 18; Ex. 12 at 19.

38.    Each family, in aggregate, has *equal* control of the boards of directors and boards of managers of the Butterfield entities. The fact that no one individual, entity, or family owns a majority of the Butterfield entities was by design. The Jafari and Vangel families made a deliberate decision to ensure that no one individual owner or family alone could manage or determine the

fortunes of the businesses. None of the owners of the Butterfield entities—each a minority shareholder—can control the ordinary actions of the businesses.

### 2. Management of the Other Butterfield Entities

39. Dr. Jafari does not exercise control over any of the Butterfield entities by way of management, nor do any other members of the Jafari or Vangel families.

40. Beaver Creek is a small construction management company managed by John Maze, who is not involved with the other Butterfield entities. *See* Ex. 12 at 19.

41. LaGrange's operating agreement allows for the appointment of officers, but LaGrange has never appointed any. Ex. 11. Instead, LaGrange has two managers—one from the Jafari family and one from the Vangel family. Dr. Jafari is one of the managers, but he does not have the power to control LaGrange.

42. As with Bolingbrook, both Naperville and Butterfield HCG's by-laws indicate that a "President" is "in charge of" the business of the company. *See* Ex. 13 (Naperville By-Laws at 13); Ex. 10 at 9. However, as with Bolingbrook, this is merely a corporate formality rather than a reflection of either entity's actual management. The by-laws directly stipulate that the president *does not have control* over the management of the entities and instead acts *"[s]ubject to the direction and control of the board of directors*[.]" *See, e.g.*, Ex. 13 at 13; Ex. 10 at 9 (The President shall be … "[s]ubject to the direction and control of the board of directors[.]").

43. While Dr. Jafari is listed on paper as "President" of Naperville and Butterfield HCG, Dr. Jafari does not actually—nor could he—wield the powers generally attributed to a president and is in no way engaged in the running of the nursing home facilities. *See* Ex. 4; Ex. 5. Just as is the case at Bolingbrook, Dr. Jafari's title on paper gives him no greater control than the other minority owners and board members. He has never been involved in the day-to-day operations

at any of the Butterfield entities, and he has never exercised any powers typically granted to a president. *See* Ex. 5 at ¶¶ 9-10; Ex. 5 at ¶ 6. For example:

    a.  He receives no salary from Bolingbrook or any of the Butterfield entities where he holds the title "president" or "manager." Ex 13 at ¶ 13.

    b.  He has never hired or fired any employees of Bolingbrook or any of the Butterfield entities. Ex, 13 at ¶ 11; Ex, 14. at ¶ 7.

    c.  He has never even met most of the Butterfield administrators. Ex. 13 at ¶ 10.

    d.  He has not set foot inside Bolingbrook or the Butterfield entities in years. *Id.*; Ex, 14. at ¶ 9.

    e.  He has never set or controlled the budgets of Bolingbrook or the Butterfield entities. Ex. 13 at ¶ 12; Ex, 14. at ¶ 10.

    f.  He does not have an office or even a desk at Bolingbrook or any of the Butterfield entities. Ex. 13 at ¶ 13; Ex, 14. at ¶ 7.

44.    Instead, like Bolingbrook, both Naperville and LaGrange are each nursing homes, and their day-to-day operations are controlled by a nursing home administrator, as is required by Illinois law. *See* 210 Ill. Comp. Stat. 45/3-117(6); Ex. 7; Ex. 14 (Naperville & LaGrange Organizational Charts). The Naperville and LaGrange administrators have the same responsibilities as Bolingbrook's administrator, Amy Hammond, and the administrators are unrelated to the Jafari and Vangel families.

45.    Butterfield HCG is not a nursing home facility, but rather a business services entity that services the nursing homes. If an individual is deemed to control Butterfield HCG, it should be its Chief Operating Officer, Christopher Vangel. *See* Ex. 18 (Butterfield HCG Organizational Chart).

46.    Dr. Jafari does not communicate with the administrators who manage the Butterfield nursing homes, and he is not engaged in the running of the facilities. The other officers of the Butterfield nursing homes—to the extent they have them—also are not involved in the day-to-day management of the businesses.

**C.    Other Entities Owned Solely by Dr. Jafari**

47.    Dr. Jafari is the majority owner of nine entities we will collectively refer to as the "Oak Brook" entities. No other members of the Jafari family, and no members of the Vangel family, have any ownership interest in or involvement with the Oak Brook entities. The "Oak Brook" entities are as follows:

    a.  Oak Brook Anesthesiologists

    b.  Oak Brook Surgical Centre, Inc.

    c.  Oak Brook Medical Management, Inc.

    d.  Oak Brook Centre for Health, Inc.

    e.  Oak Brook X-Ray & Imaging, Inc.

    f.  Oak Brook Medical & Surgical Centre, Inc.

    g.  Aiden Center for Day Surgery, LLC

    h.  Great Oak Insurance Agency, LLC

    i.  1800 McDonough Road Surgery Center, LLC

48.    The Oak Brook entities are not nursing home facilities, nor are they engaged in the nursing home industry. Oak Brook Anesthesiologists, for example, hires board-certified anesthesiologists who service medical and surgical centers.

**D.    Bolingbrook Met the Alternative Size Standard To Qualify for the PPP Loan.**

49.    Bolingbrook was also eligible for its PPP loan because it met the alternative size standard for size eligibility. Specifically, Bolingbrook, together with any affiliates, had a tangible net worth under $15 million and an average net income under $5 million.

## PROCEDURAL BACKGROUND

A.    **Bolingbrook's PPP loan**

50.    As authorized by the CARES Act, Bolingbrook applied for a $2,201,641 PPP loan on April 14, 2020, to support its operations and forestall staff layoffs. Ex. 1 at 19-20. The SBA approved Bolingbrook's loan on April 28, 2020, and Bolingbrook's lender disbursed the loan the following day. *Id*. at 17.

51.    After using the entirety of its loan on employee payroll, spending $2,227,864 on staff salaries and benefits between the date it received its loan and July 21, 2020, Bolingbrook applied for full forgiveness of the loan on August 18, 2020. *Id*. at 1616. Bolingbrook submitted an updated forgiveness application on December 3, 2020, correcting minor mistakes in the dollar figures entered on the application. *See id.* at 343-46.

52.    After submitting its loan forgiveness application, Bolingbrook received a number of follow-up requests from the SBA to which Bolingbrook responded by providing the requested information and documentation.

53.    The SBA informed Bolingbrook that it believed it had discovered the "affiliation of 14 total loans through familial ties and/or common management" and that this affiliate group exceeded "the maximum employee standard size of 500 employees allowed under the PPP Program." *Id.* at 1611.

54.    Specifically, SBA stated that it believed Bolingbrook was "affiliated" with the following 13 entities:

1. Butterfield Health Care II, Inc. dba Meadowbrook Manor of Naperville ("Naperville")
2. Butterfield Health Care VII, LLC dba Meadowbrook Manor of LaGrange ("LaGrange")
3. Butterfield Health Care Group, Inc. ("Butterfield HCG")
4. Beaver Creek Construction, LLC ("Beaver Creek")
****
1. Oak Brook Surgical Centre, Inc.
2. Oak Brook Medical Management, Inc.
3. Oak Brook Anesthesiologists
4. Oak Brook Centre for Health, Inc.
5. Oak Brook X-Ray & Imaging, Inc.
6. Oak Brook Medical & Surgical Centre, Inc.
7. Aiden Center for Day Surgery, LLC
8. Great Oak Insurance Agency, LLC
9. 1800 McDonough Road Surgery Center, LLC

*Id*.

55.     As previously noted, we refer to the first four entities as the "Butterfield entities" and the remaining nine entities as the "Oak Brook entities," without conceding any "affiliation" among them.

56.     Bolingbrook responded to the SBA's requests with letters explaining that Bolingbrook is not affiliated with the Oak Brook entities. *Id*. at 1645-50. Bolingbrook attached to its letters detailed information about the ownership and management of the Butterfield and Oak Brook entities.

**B.      The SBA's Final Loan Review Decision**

57.     The SBA issued a Final Loan Review Decision denying Bolingbrook's forgiveness application on March 23, 2022. *Id*. at 17-18. The SBA reasoning for issuing the denial to Bolingbrook is set forth as follows:

> SBA has determined that the borrower was ineligible for the PPP loan. The reason(s) for SBA's decision is as follows:
>
> After review of the documentation provided, the SBA concludes the Borrower business, or together with its affiliates, exceeds the maximum allowable number of employees and the SBA small business size standards.

The aggregate of loans for this affiliation exceeds the maximum allowable number of employees; therefore, this loan is deemed ineligible.

*Id.* at 17-18.

**C.   OHA Appeal**

58.   On April 25, 2022, Bolingbrook filed a timely appeal with OHA. Ex. 15 (OHA Appeal). Bolingbrook argued that SBA's decision was based on material errors of fact and law because, contrary to the SBA's denial justification, Bolingbrook is not affiliated with the Butterfield entities or the Oak Brook entities under the affiliation rules applicable to PPP loans. Absent this affiliation, Bolingbrook had fewer than 500 employees at the time of loan application, and, therefore, the SBA's Final Loan Review Decision was erroneous. Bolingbrook requested that OHA grant Bolingbrook's appeal, issue a determination that it is eligible for the PPP loan it received, and recommend full forgiveness of the loan.

59.   SBA filed the Administrative Record on June 17, 2022. *See* Ex. 1. Undersigned counsel notified SBA counsel that the Administrative Record indicated that the SBA had conducted an analysis and found that LaGrange was eligible for the PPP because it was not affiliated with the Oak Brook entities. SBA then filed a motion to extend the close of the record and for time to file a response until August 17, 2022. On August 16, 2022, the SBA filed its response to the appeal. *See* Ex. 16 (SBA Response). In the response, SBA simply reasserted its argument that Bolingbrook was affiliated with the Butterfield and Oak Brook entities and that the employee headcount of all entities taken together exceeded the PPP's 500-employee cap.

60.   On September 6, 2022, OHA issued a brief decision ("Initial Decision") denying the appeal. *See* Ex. 17 (OHA Initial Decision). The Initial Decision adopted the legal and factual errors that formed the basis of the SBA's Final Loan Review Decision:

Appellant does not dispute that the Oak Brook entities are affiliated, as Kianoosh Jafari is the majority owner of each of them. (AR at p. 1639). As for the Butterfield entities, the Jafari family holds a 50% ownership interest in all four. (AR at pp. 1638, 1640). Kianoosh Jafari is the President of the four Butterfield entities. (Portal Doc, Brief in Support of Appeal, at p. 10). As provided in 13 C.F.R. § 121.301(f)(1), this establishes affiliation based on ownership. Accordingly, the Oak Brook entities and the Butterfield entities are affiliates of one another.

Taken together, the entities have a total of 630 employees. This exceeds the maximum of 500 as established in the first IFR implementing the PPP. Appellant was not eligible for its PPP loan and is ineligible for loan forgiveness.

Ex. 17 at 5.

61.    On September 16, 2022, Bolingbrook filed a Petition for Reconsideration of the Initial Decision and a Motion for Leave to File a Supplemental Pleading responding to the SBA's Response. Ex. 18 (Petition for Reconsideration); Ex. 19 (Motion for Leave to File a Supplemental Pleading).

62.    Bolingbrook argued that: (1) OHA's Initial Decision was premised on a material error of fact because Dr. Kianoosh Jafari is *not* the President of LaGrange or Beaver Creek, and so OHA erred in concluding that he was the president of *all* four Butterfield entities; (2) the Initial Decision was premised on an error of law because § 121.301(f)(1) does not provide that an individual's "president" title automatically gives that individual control of the business; (3) SBA previously determined that LaGrange was not affiliated with the Oak Brook entities and a decision to the contrary without a reasonable explanation is arbitrary; and (4) the Administrative Record indicates that Bolingbrook was eligible for its PPP loan because it qualified under the alternative size standard.

63.    On October 11, 2022, OHA granted Bolingbrook's Motion for Leave to File a Supplemental Pleading. At the same time, OHA issued an Order to Show Cause directing the SBA to show why the appeal should not be remanded for further consideration. Ex. 20 (Order to Show

Cause). On October 18, 2022, SBA responded requesting that OHA deny the Petition for Reconsideration and uphold the OHA's Initial Decision.

64.    On October 20, 2022, OHA issued a decision denying the Petition for Reconsideration. Ex. 22 (OHA Denial of Reconsideration). OHA's terse opinion rejects Bolingbrook's arguments in turn.

65.    As to the argument that Dr. Jafari is not the President of LaGrange, OHA ignores the evidence and documentation proffered by Bolingbrook and instead notes only that SBA's affiliation analysis did not rest on this fact alone and was also premised on a finding of affiliation based on identity of interest. OHA similarly failed to analyze Bolingbrook's argument that Section 121.301(f)(1) does not provide that a title of "president" automatically confers control to the individual who holds that title. As to the SBA's previous determination on affiliation, OHA simply responded that SBA is not bound by previous determinations. Finally, OHA made no ruling on the substance of Bolingbrook's alternative size standard argument—which is supported by the Administrative Record—instead simply pointing to SBA's contested representation that it had not received the necessary documentation to support an alternative size standard determination.

66.    Pursuant to 13 C.F.R. § 134.1201(b), a "final SBA loan review decision" is an official written decision by SBA after SBA completes a review of a PPP loan, that finds—among other things—that a borrower was "ineligible for a PPP loan." An appeal of a final loan review decision to OHA is "an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a Federal district court." *See* 13 C.F.R. § 134.1201(d).

67.    SBA's decision denying Bolingbrook's loan forgiveness application was a final loan review decision as it was a written decision by the SBA after review of Bolingbrook's

application that found Bolingbrook ineligible for its PPP loan. Bolingbrook exhausted its administrative remedy by filing an appeal of SBA's decision to OHA and then by filing a Petition for Reconsideration of OHA's Initial Decision.

68.    Pursuant to 13 C.F.R. § 134.1211(c), "OHA will decide the request for reconsideration and OHA's decision on the request for reconsideration is a reconsidered initial OHA decision…. A reconsidered initial OHA decision becomes the final decision of SBA 30 calendar days after its service…."  Therefore, OHA's Denial of Bolingbrook's Petition for Reconsideration of the Initial Decision is a final decision of the Agency. Thus, Bolingbrook seeks this Court's review of the final decision.

## COUNT I

**The Agency's Determination that Dr. Jafari is the President of All Four Butterfield Entities is Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not in Accordance with Applicable Law.**

69.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

70.    The APA authorizes judicial review of federal agency actions. 5 U.S.C. § 702. The APA provides that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2).

71.    SBA's denial of Bolingbrook's loan forgiveness application and OHA's Decision Denying Bolingbrook's Petition for Reconsideration of its Initial Decision were arbitrary, capricious, and contrary to applicable law. OHA predicated its decision on the materially false conclusion that "Kianoosh Jafari is the President of the four Butterfield entities" as well as Bolingbrook. Ex. 15 at 5. OHA then concluded that "[a]s provided in 13 C.F.R. § 121.301(f)(1),

this establishes affiliation based on ownership. Accordingly, the Oak Brook entities and the Butterfield entities are affiliates of one another." *Id*.

72.     This conclusion is arbitrary and capricious because there is *no* basis in the record for this finding. Nothing in the administrative record supports the conclusion that Dr. Jafari is the President of *all* four Butterfield entities. Instead, as the record clearly notes, while LaGrange and Beaver Creek's operating agreements allow for officers, neither entity has appointed any, and, therefore, the entities *have no president*. Only by disregarding the evidence in the record could OHA reach the determination that Dr. Jafari is the president of all four Butterfield entities, including LaGrange and Beaver Creek.

73.     OHA's determination, ungrounded in anything in the record, was essential to OHA's ultimate determination that Bolingbrook and the Oak Brook entities are affiliated and thus ineligible for the PPP loans they received because together they exceed the PPP's 500-employee threshold. Only by aggregating all fourteen entities together does the employee headcount reach the 630 figure that SBA and OHA rely upon to determine that Bolingbrook was ineligible for its loan. Ex. 1 at 1641; Ex. 17 at 5 ("Taken together, the entities have a total of 630 employees. This exceeds the maximum of 500 as established in the first IFR implementing the PPP.")

74.     Without the arbitrary, capricious, and unsupportable determination that Dr. Jafari is the president of LaGrange and Beaver Creek, the decision to deny Bolingbrook's loan forgiveness application falls apart. LaGrange had 172 employees at the time of its PPP loan application, and Beaver Creek had 4. Ex. 1 at 1637. Even assuming arguendo that the remaining entities were affiliated, had the SBA correctly acknowledged that Dr. Jafari is not the president of LaGrange, then the headcount of all the remaining entities was below the 500-employee threshold

applicable to first draw PPP loans, and all entities remain eligible for the first draw PPP loans they received.

75.    Because an essential factual premise on which the Agency's final decision relied has no basis in the record, the Court should set aside the Agency's final decision and grant Plaintiff's loan forgiveness application.

## COUNT II

**The Agency's Determination that Dr. Jafari Controls Bolingbrook and the Butterfield Entities has No Basis in Fact or Law and is Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not in Accordance with Applicable Law.**

76.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

77.    In denying Bolingbrook's loan forgiveness application, the SBA, and later OHA, determined that Bolingbrook and the Butterfield entities are affiliated with the Oak Brook entities because Dr. Jafari controls Bolingbrook and the Butterfield entities and is the majority owner of the Oak Brook entities. This decision is arbitrary, capricious, and an abuse of discretion, and the Court must set aside the Agency's final decision on this basis. 5 U.S.C. § 706(2).

78.    Although Dr. Jafari is listed on paper as the President of Bolingbrook, Naperville, and Butterfield HCG, this is a corporate formality, and he does not—and is not—able to control these entities. Dr. Jafari is an 81-year-old obstetrician-gynecologist who specializes in gynecologic oncology. Bolingbrook and Naperville are nursing home facilities, while Butterfield HCG is a business services entity. Dr. Jafari does not manage or control Bolingbrook, Naperville, or Butterfield HCG, and he is in no way engaged in the running of these entities. Rather, his role is limited to his position as a minority shareholder and board member.

79.    As explained in declarations submitted to the SBA by Christopher Vangel and Dr. Jafari, Dr. Jafari's title of "president" of Bolingbrook, Naperville, and Butterfield HCG does not

grant him control of these entities. *See* Ex. 4; Ex. 5. He receives no salary from Bolingbrook as its "president" or from any of the Butterfield entities where he holds the title "president" or "manager." *See* Ex. 4 at ¶ 13. He has never hired or fired any employees of Bolingbrook or any of the Butterfield entities. *Id*. At ¶ 10; Ex. 5 at ¶ 7. He has never even met most of the Butterfield administrators. Ex. 4 at ¶ 10. He has not set foot inside Bolingbrook or the Butterfield nursing homes in years. *Id*. At ¶ 10; Ex. 5 at ¶ 9. He has never set or controlled the budgets of Bolingbrook or the Butterfield entities. Ex. 4 at ¶ 12; Ex. 5 at ¶ 10. He does not have an office or even a desk at Bolingbrook or any of the Butterfield entities. Ex. 4 at ¶ 13; Ex. 5 at ¶ 8.

80.     This lack of authority is reflected in the by-laws of Bolingbrook, Naperville, and Butterfield HCG which directly stipulate that the president *does not have control* over the management of the entity and instead acts *"[s]ubject to the direction and control of the board of directors*[.]" *See, e.g.*, Ex. 3 at 8; Ex. 13 at 13; Ex. 10 at 9.

81.     As set forth in the declarations of Dr. Jafari and Christopher Vangel, Dr. Jafari does not have the ability—in theory or in practice—to "be in charge of" Bolingbrook or the Butterfield entities and this is reflected in the business reality on the ground. As outlined in Dr. Jafari's and Mr. Vangel's Declarations, there have been numerous instances over the years where the boards went against Dr. Jafari's recommendations and objections, demonstrating that Dr. Jafari held no more sway or control than any other minority owner or board member. Ex. 4 at ¶ 17(a)-(h); Ex. 5 at ¶ 14(a)-(h). Importantly, any recommendations Dr. Jafari did seek to give came from him in his capacity as a board member, not as the "president."

82.     Furthermore, the Illinois Nursing Home Administrators Licensing and Disciplinary Act requires that nursing homes be operated by a licensed administrator, and it is unlawful for anyone who is not licensed to "operate or manage" a nursing home in the state. *See* Section 225

ILCS 70/10. In accordance with Illinois law, Bolingbrook, Naperville, and LaGrange's skilled nursing home Administrators hold the power to control the facilities under the control of the Board.

83.    While Dr. Jafari may be listed on paper as the president of Bolingbrook and Naperville, the Nursing Home Administrator License and Application for Bolingbrook and Naperville show that Amy Hamond, Bolingbrook's Administrator, and Alison Elsner, Naperville's Administrator, are the legal operators of the entities. Ex. 8 (Bolingbrook License and Application); Ex. 23 (Naperville License and Application). For example, on the license application for Bolingbrook, Amy Hammond signs the license application as the "Facility Administrator and/or Owner". Ex. 8 at 11. It is Ms. Hammond who is designated by Illinois state law as operator of the facility, and without her license, the facility could not operate. In contrast, Dr. Jafari has never held a nursing home administrator license and—pursuant to state law—cannot be the one directly responsible for operating the nursing home entities.

84.    Amy Hammond and Alison Elsner "direct the day-to-day functions of the facility" and their responsibilities include the following:

    a.  Assume the administrative authority, responsibility, and accountability for all programs in the facility.

    b.  Establish the planning, development, implementation, monitoring and execution of recruitment selection and retention practices.

    c.  Assist in the recruitment and selection of competent department directors, supervisors, facility non-licensed staff consultants, etc.

    d.  Counsel/discipline personnel as requested or as necessary in accordance with local, state, and federal labor laws; stay abreast of labor law changes and implement appropriate facility policies to reflect changes.

    e.   Delegate administrative authority, responsibility and accountability to other staff personnel as deemed necessary to perform their assigned duties.

    f.   Ensure that an adequate number of appropriately trained, competent, licensed professionals and non-licensed personnel are on duty at all times to meet the needs of the residents.

    g.   Terminate employment of personnel when necessary, documenting and coordinating such actions with the Director of Human Resources.

    h.   Authorize the purchase of major equipment/supplies in accordance with established purchasing policies and procedures.

    i.   Develop and manage annual operational and capital budgets.

See Ex. 7 at 1-5. As these responsibilities demonstrate, Ms. Hammond and Ms. Elsner control the operations of Bolingbrook and Naperville, not Dr. Jafari. SBA and OHA made a material error of law in rejecting Plaintiff's explanation that these administrators control the entities. SBA and OHA's findings lacked any rational basis, and documents supporting this conclusion cannot be found in the Administrative Record.

    85.   OHA cites to 13 C.F.R. § 121.301(f)(1) in making its determination that Dr. Jafari is in control but provides no explanation as to why his listing on paper as president of Bolingbrook, Naperville, and Butterfield HCG automatically provides him with control over all the Butterfield entities, or why this then creates an affiliation between Bolingbrook and the Oak Brook entities. Ex. 17 at 5.

    86.   The SBA's 2016 rulemaking explicitly acknowledges management structures where a position other than the President, CEO, Managing Partner, or Principal Manager of the concern controls the management of the concern:

*Section 121.301(f)(1)*. SBA proposed establishing the new § 121.301(f)(1) *Affiliation Based on Ownership*, where SBA would determine that control exists based on ownership when: (1) A person owns or has the power to control more than 50% of the voting equity of a concern; or (2) if no one person owns or has the power to control more than 50% of the voting equity of the concern, SBA would deem the small business to be controlled by either the President, Chairman of the Board, Chief Executive Officer (CEO) of the concern, or other officers, managing members, partners, or directors who control the management of the concern. A total of 155 commenters supported a change in the rule, with 34 of the commenters **proposing further modification to limit the scope to only the President, CEO, Managing Partner, or Principal Manager. The comments for limiting scope were not adopted as it would not include all potential management and ownership organizational structures.**

2016 FR 41423, 41425 (emphasis added). Accordingly, the rule provides that "[i]f no individual, concern, or entity is found to control, SBA will deem the Board of Directors *or* President *or* Chief Executive Officer (CEO) (*or other officers, managing members*, or partners who control the management of the concern) to be in control of the concern." 13 C.F.R. § 121.301(f)(1) (emphasis added).

87.    Thus, under § 121.301(f)(1), it was arbitrary and capricious for OHA to uphold SBA's decision that Dr. Jafari exercises control over Bolingbrook, as opposed to its administrator or even its Board of Directors, both of which have the ability to exercise actual control.

88.    Because the decision that Dr. Jafari exercises control over Bolingbrook has no basis in the record and is an essential factual premise on which the Agency's final decision relied, the Court should set aside the Agency's final decision.

### COUNT III

**The Agency's Determination That Plaintiff Was Affiliated with The Oak Brook Entities Based On Identity Of Interest is Arbitrary and Capricious, An Abuse Of Discretion, and Otherwise Not in Accordance With Applicable Law.**

89.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

90.     In response to Bolingbrook's petition for reconsideration, OHA reasons that Bolingbrook was affiliated with the Oak Brook entities on the basis of identity of interest. Ex. 22 ("In any event, the Initial Decision did not rest solely on a finding of affiliation based on ownership. It also concluded that the Butterfield and Oak Brook entities were affiliated based on identity of interest.").

91.     Plaintiff acknowledges that members of the Jafari family and the Vangel family collectively each hold a 50% ownership interest in Bolingbrook. However, these facts do not trigger the identity of interest rule such that Bolingbrook and the Oak Brook entities are affiliated.

92.     The regulation provides that affiliation based on identity of interest arises only "with identical or substantially identical business or economic interests." 13 C.F.R. 121.301(f)(4). The regulation then provides that the SBA's determination of identity of interest can be rebutted by showing that interests are, in fact, separate.

93.     Dr. Jafari and members of his family frequently have diverging business or economic interests. Dr. Jafari and Christopher Vangel's declarations include numerous examples of where Dr. Jafari's interests significantly deviated from those of his family and the other members of the boards. Ex. 4 at ¶ 17; Ex. 5 at ¶ 14. These examples show that Dr. Jafari's interests are not identical or even substantially identical to the business or economic interests of other members of the board, including those interests of members of his own family. *See Size Appeal of GPA Tech., Inc.* SBA No. SIZ-5307 (2011) (recognizing "that directors can and do act in opposition to each other" (citing *Size Appeal of Bob Jones Realty Co.*, SBA No. SIZ-4059, at 5- 6 (1995)).  Dr. Jafari's son, Robert Jafari, does not own or work for any of the Oak Brook entities.

94.     Further, the Butterfield entities are nursing home businesses, while the Oak Brook entities are an ambulatory surgery center, a management business, an anesthesiologist support

business, and a medical practice group. Therefore, finding that the Butterfield entities and the Oak Brook entities are affiliated based on identity of interest was arbitrary, capricious, and an abuse of discretion.

95.     Even assuming for the sake of argument that members of the Jafari family's interests should be aggregated under Section 121.301(f)(4), this does not grant the Jafaris the collective power to control Bolingbrook because their aggregated interests still only amount to 50%, meaning that the Jafari family still lacks "the power to control more than 50 percent of [Bolingbrook's] voting equity." 13 C.F.R. 121.301(f)(1).

96.     OHA then seeks to argue that "[t]he Jafari family, at a minimum, exercises negative control over the Butterfield entities." Ex. 22 at 3. However, the plain language of Section 121.301(f)(1) undermines this argument.

97.     Section 121.301(f)(1) has three tests for determining control of the entity. First, the SBA looks to whether an individual, concern, or entity owns or has the power to control *more than* 50 percent of the concern's voting equity. If an individual, concern, or entity meets this test, then the analysis is finished. If not, then the SBA will apply the second test and look to whether the board of directors, an officer, managing member, or partner is in control of the management of the entity. If control is still not established, then the SBA will look to its third test and may deem a minority shareholder to be in control "if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *See* 13 C.F.R. § 121.301(f)(1); *see also* 81 FR 41423, 41426 ("SBA also proposed to omit 'negative control' as a stand-alone factor in determining affiliation for the purpose of loan eligibility.").

98.     OHA makes two material errors in looking to this third negative control test to find affiliation between Bolingbrook and the Oak Brook entities. First, as discussed above, the nursing homes each have an administrator who is, by law, the individual in control of the operations of the entities. The other two Butterfield entities similarly have administrators who manage the nursing homes. Therefore, the SBA should have ended its analysis there, and the negative control test need not have been applied.

99.     Second, OHA overlooks the simple fact that even if the Jafari family's interests are aggregated, and even if the negative control test could apply to a group of separate individuals who hold separate interests, the family is still unable to "prevent a quorum or otherwise block action by the board of directors or shareholders." *See* 13 C.F.R. 121.301(f)(1).

100.    A deadlock by Bolingbrook's board of directors (regardless of whether deadlock is divided along family lines or results in some other 50/50 split amongst members of the board) results in arbitration, and the deadlock is resolved by an arbitrator. Therefore, even if the Jafari family were to all vote together, they would still be unable to prevent a quorum or effectively block any action by the board. OHA ignores this fact without explanation.

101.    OHA's finding that Bolingbrook and the Oak Brook entities were affiliated on the basis of identity of interest was arbitrary, capricious, and not in accordance with applicable law, and as such, the Court should set aside the Agency's final decision.

**COUNT IV**

**The Determination that Bolingbrook Did Not Qualify Under the Alternative Size Standard is Arbitrary and Capricious, An Abuse Of Discretion, and Otherwise Not in Accordance with Applicable Law.**

102.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

28

103.    As confirmed by the SBA in its Frequently Asked Question #2 issued on April 6, 2020, small business concerns can be eligible borrowers even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632. A business can, therefore, qualify as an eligible PPP borrower if it meets the SBA's employee-based or revenue-based size standard corresponding to its primary industry.

104.    Additionally, a business could qualify for the PPP as a small business concern if it met both tests in SBA's "alternative size standard," which, as of March 27, 2020, required that: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million. *See* SBA Paycheck Protection Program Loan Frequently Asked Questions, FAQ 2 (as of July 29, 2021).

105.    Bolingbrook submitted to SBA a letter and supporting documentation demonstrating that it and the Butterfield entities met the alternative size standard when considered individually and collectively. Ex. 19 at 14-28. The letter included a completed Form 3511 as an exhibit explaining the numbers used in the analysis. *Id.* at 17-23.

106.    Nevertheless, the SBA asserted to OHA incorrectly that Bolingbrook failed to provide SBA the necessary information to make an analysis, and OHA adopted this position in its denial of Bolingbrook's petition for reconsideration. Ex. 22 at 3; Ex. 17.

107.    The SBA's incorrect assertion and OHA's adoption of this assertion and failure to consider the alternative size standard argument are not only unreasonable, but the failure to grant Bolingbrook's appeal based on its alternative size standard eligibility also runs counter to the information in the Administrative Record.

108.    The Administrative Record reveals that the SBA conducted an alternative size standard analysis of the Butterfield entities, as well as Bolingbrook, and determined that LaGrange (Butterfield Health Care VII) was eligible for its first draw loan under the alternative size standard. This analysis supports Bolingbrook's argument that it too was eligible for its PPP loan under the alternative size standard. Ex. 1 at 1644, 1682-85. The SBA's own analysis demonstrates that even when considered together as affiliates, the *collective* average tangible net worth of Bolingbrook, Butterfield HCG, LaGrange, and Naperville was under $15 million (*id*. at 1644), and the collective average net income was under $5 million (*id*. at 1644, 1682-85). While the SBA's analysis did not include Beaver Creek, Beaver Creek's inclusion would not change the outcome of the analysis.

109.    Thus, Bolingbrook and the Butterfield entities, both collectively and individually, meet the alternative size standard.

110.    Bolingbrook highlighted to SBA counsel and to OHA the SBA's contradictory findings of eligibility for LaGrange and Bolingbrook. If the SBA found that LaGrange was not affiliated with the Oak Brook entities and was eligible under the alternative size standard, it is completely contradictory that SBA would find Bolingbrook ineligible under the alternative size standard *using the same exact* information utilized by SBA in its LaGrange eligibility determination.

111.    OHA issued SBA an Order to Show Cause to respond to Bolingbrook's argument that the SBA should reach the same eligibility determination for Bolingbrook that it did for LaGrange. On October 18, 2022, the SBA responded by stating that "this preliminary analysis, which was later revised after SBA discovered additional relevant affiliates, was not considered as part of the FLRD in the instant appeal." Ex. 21 at 3. The SBA added that "[p]reliminary analysis for a different loan based on inaccurate and incomplete facts is not relevant to this appeal and

therefore is not properly part of the Record in this case." *Id.* OHA was persuaded that the SBA's LaGrange determination was "based on a preliminary SBA determination that was later revised." Ex. 22 at 3.

112.    On information and belief, the SBA's preliminary analysis and finding that LaGrange was eligible for its first draw loan has not actually been revised. SBA forgave LaGrange's first draw loan in December 2021 and completed its "preliminary analysis" prior to March 18, 2022. Nearly one year after SBA represented to OHA that it revised its "preliminary analysis" that found LaGrange eligible under the alternative size standard, the SBA's forgiveness decision on LaGrange's first draw loan still stands.

113.    OHA's refusal to consider whether Bolingbrook and the Butterfield entities qualified under the alternative size standard is arbitrary and capricious, and contrary to applicable law and the Court should set aside OHA's Initial Decision.

*        *        *

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests that the Court order the following relief:

A.  Declare that the Agency's denial of Plaintiff's loan forgiveness application was unlawful;

B.  Declare that the Agency's denial of Plaintiff's loan forgiveness application was arbitrary and capricious;

C.  Declare that the Agency's denial of Plaintiff's loan forgiveness application was an abuse of discretion;

D.  Vacate and set aside the Agency's denial of Plaintiff's loan forgiveness application;

E.  Declare that the Agency must forgive Plaintiff's PPP loan;

F.  Declare that Plaintiff is an "eligible recipient" under the CARES Act;

G.  Award costs and reasonable attorney fees to the extent permitted by law; and

H.  Grant any other relief as this Court may deem proper.

/s/ Sam C. Neel
_____

Sam C. Neel (DC Bar No. 1027756)
McDermott Will & Emery LLP
500 North Capitol St., N.W.
Washington, D.C. 20001
(202) 756-8821

Llewelyn Engel (DC Bar No. 1615840)
McDermott Will & Emery LLP
500 North Capitol St., N.W.
Washington, D.C. 20001
(202) 756-8514

*Counsel for Plaintiff*

Dated:  September 21, 2023